**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCOTT FAIRLAMB,<br>*Address Filed Under Seal*<br>Plaintiff,<br><br>-against-<br><br>UNITED STATES OF AMERICA,<br>*c/o U.S. Attorney's Office, District of Columbia,*<br>*950 Pennsylvania Avenue, NW Washington, DC 20530*<br><br>MERRICK GARLAND, individually,<br>*c/o Arnold & Porter 601 Massachusetts Ave, NW*<br>*Washington, DC 20001-3743*<br><br>MATTHEW GRAVES, individually,<br>*c/o Winston Taylor LLP, 1901 L Street NW,*<br>*Washington, DC 20036*<br><br>DONALD W. WASHINGTON, individually,<br>*Jones Walker LLP, Suite 1600, 600 Jefferson St,*<br>*Lafayette, LA 70501*<br><br>KATHLEEN LANDERKIN, individually,<br>*Warden, Baltimore Pre-Trial Complex,*<br>*300 E. Madison Street, Baltimore, MD 21202*<br><br>ROBERT ANTHONY DIXON, individually,<br>*U.S. Marshals Service, Superior Court of D.C.,*<br>*Moultrie Courthouse, 500 Indiana Avenue NW,*<br>*Washington, DC 20001*<br><br>and<br><br>JOHN DOES 1-25, individually,<br><br>Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiff SCOTT FAIRLAMB (hereinafter, "Plaintiff" or "Fairlamb") by and through his attorneys, Raiser, Kenniff & Lonstein, P.C. brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages arising from Defendants' violations of Plaintiff's rights under the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2. Plaintiff was targeted, arrested, prosecuted, detained, and punished because of his actual and perceived political viewpoints, expressive activity, associations, and participation in events surrounding January 6, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021 will be referred to as the "January 6th Defendants"). Defendants selectively and disproportionately exercised governmental authority against Plaintiff as part of a broader campaign directed at January 6th Defendants. Through retaliatory prosecution, discriminatory detention practices, deliberate indifference to Plaintiff's health and safety, and other unlawful conduct, Defendants violated Plaintiff's constitutional rights and caused severe physical, emotional, reputational, and economic injury.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. Jurisdiction over Plaintiff's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

6. Jurisdiction over Plaintiff's claims against defendant UNITED STATES OF AMERICA (the "United States") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

7. To the extent Plaintiff asserts constitutional claims against District of Columbia correctional officials acting under color of District of Columbia law, jurisdiction is also conferred by 42 U.S.C. § 1983.

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(e) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the District of Columbia, including the prosecution, detention, incarceration, and other conduct challenged herein.

9. This Court has personal jurisdiction over defendant KATHLEEN LANDERKIN pursuant to the District of Columbia Code §§ 13-422 and 13-422(a)(3).

10. Plaintiff attempted to file administrative grievances to timely contest his mistreatment while incarcerated at the District of Columbia Department of Corrections (hereinafter, "D.C. Jail") but both experienced and observed that whenever any of the other January 6th Defendants attempted to do so, they were the subject of punitive and retaliatory measures taken by corrections personnel. Corrections Officers would harshly interrogate those who attempted to file grievances and/or simply refuse to furnish the grievance forms. If forms were furnished, corrections officers would alter the forms to change the dates on the forms, thus

rendering the forms untimely, would untimely respond to the forms, or would vaguely claim that the forms were otherwise filled out improperly.

11. In other words, Plaintiff exhausted all administrative remedies that were available to him. To the extent Defendants contend otherwise, the grievance system was unavailable because grievances were not processed, Plaintiff was not informed of appeal rights, grievances were resolved without meaningful review, and officials retaliated against Plaintiff for using the grievance system.

12. On or about September 23, 2025, Plaintiff transmitted four administrative Notices of Claim to the United States Department of Justice ("DOJ") and the United States Bureau of Prisons ("BOP") setting forth the factual basis for his claims and demanding a sum certain. More than six months elapsed without final denial.

13. As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

## PARTIES

14. Plaintiff is a United States citizen and resident of Sussex County, State of New Jersey.

15. Defendant UNITED STATES OF AMERICA is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

16. Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

17. Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

18. Defendant DONALD W. WASHINGTON ("Marshal Washington") is sued in his individual capacity for actions taken while serving as the director of the United States Marshals Service ("USMS").

19. Defendant DEPUTY WARDEN KATHLEEN LANDERKIN ("Deputy Warden Landerkin") is sued in her individual capacity for actions taken while serving as the Deputy Warden of the D.C. Jail.

20. Defendant ROBERT ANTHONY DIXON ("Marshal Dixon") is sued in his individual capacity for actions taken while serving as the U.S. Marshal for the USMS for the Superior Court of the District of Columbia.

21. Defendants JOHN DOES 1-25, individually, include but are not limited to unknown agents, officers, employees, supervisors, policymakers, prosecutors, public-affairs personnel, and other officials of the United States Department of Justice, the United States Attorney's Office for the District of Columbia, and/or the Federal Bureau of Investigation who personally participated in, directed, approved, ratified, supervised, or knowingly permitted the investigative, public-facing, charging, prosecutorial, search, arrest, or other law-enforcement actions complained of herein.

## FACTUAL ALLEGATIONS

22. Plaintiff is a lifelong New Jersey resident, husband, and small business owner. In 2010, Plaintiff was diagnosed with leukemia and successfully managed that condition through prescription medication and monthly oncology appointments for several years. Despite his chronic illness, Plaintiff owned and maintained a gym and personal training business.

23. In 2012, Plaintiff's parents were riding a motorcycle when they were struck by a car in a head-on collision. Plaintiff's father died and his mother had to undergo twenty-six surgeries

and is permanently disabled. Prior to his incarceration, Plaintiff lived near his mother and would care for his mother throughout the week.

24. On January 6th, 2021, a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

25. On that day, Plaintiff was present in Washington, D.C. to exercise his First Amendment rights by attending a political rally and listening to a speech that Plaintiff believed was to be given by then-President Trump.

26. Plaintiff encountered several law enforcement officers on the day of January 6th. Plaintiff assaulted one of the officers he encountered, and, as will be discussed below, later sought to take responsibility for his actions by pleading guilty to same and offering to personally apologize to the officer. However, prior to that assault, Plaintiff encountered approximately five U.S. Capitol Police Officers who were struggling to prevent other January 6th participants from gaining entry into the U.S. Capitol Building through the Parliamentarian Door. Plaintiff offered these officers water and then helped extricate them to safety, urging other participants to leave them alone.

27. Plaintiff was arrested on January 22, 2021 at his home. Plaintiff surrendered peacefully and complied fully with the agents' directions. The arresting agents later confirmed his compliance and that the Plaintiff was calm, cooperative, and polite.

28. Following his arrest, Plaintiff appeared in the United States District Court for the District of New Jersey for an initial appearance. A federal Magistrate Judge initially found it unnecessary to detain Plaintiff pretrial and ordered Plaintiff to be released from custody with conditions. Plaintiff's wife immediately sought to comply with the conditions, such as obtaining a landline phone.

29. However, the Government immediately requested a stay of the release order and appealed the Magistrate Judge's decision; the stay was granted. On the same day, the Government filed a motion to transfer the action to the United States District Court, District of Columbia. The motion to transfer was granted on January 22, 2021. Plaintiff remained in pretrial custody and the criminal action proceeded in the United States District Court, District of Columbia, under Case No. 21-cr-120.

30. Plaintiff suffered a heart attack on January 27, 2021, while he was in custody at the Hudson County Jail.

31. Plaintiff was transferred to the D.C. Jail on March 16, 2021.

32. Upon transfer, on March 17, 2021, the Government moved for continued pretrial detention without bond. The motion was granted on April 26, 2021.

33. A superseding indictment was entered on April 7, 2021. Plaintiff was charged with violating:

a. 18 U.S.C. § 231(a)(3): Civil Disorder;

b. 18 U.S.C. § 1512(c)(2): Obstruction or Impeding Any Official Proceeding and Aiding and Abetting;

c. 18 U.S.C. §§ 111(a)(1), (b): Assaulting, Resisting, or Impeding Certain Officers;

d. 18 U.S.C. §§ 1752(a)(1), (b)(1)(A): Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon;

e. 18 U.S.C. §§ 1752(a)(2), (b)(1)(A): Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon;

f. 18 U.S.C. §§ 1752(a)(3): Impeding Ingress and Egress in a Restricted Building or Grounds;

g. 18 U.S.C. §§ 1752(a)(4): Engaging in Physical Violence in a Restricted Building or Grounds;

h. 40 U.S.C. § 5104(e)(2)(D): Disorderly Conduct in a Capitol Building;

i. 40 U.S.C. § 5104(e)(2)(E): Impeding Passage Through the Capitol Grounds or Buildings.

j. 40 U.S.C. § 5104(e)(2)(F): Act of Physical Violence in the Capitol Grounds or Buildings;

k. 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building; and

l. 40 U.S.C. § 5104(d): Stepping, Climbing, Removing, or Injuring Property on the Capitol Grounds.

34. Notably, Plaintiff was charged with violating 18 U.S.C. § 1512(c)(2), obstruction of an official proceeding.

35. After the Government appealed the federal Magistrate Judge's release order, Plaintiff was denied bond and was subject to pre-trial detention at the D.C. Jail.

36. At this time, the Deputy Warden of the D.C. Jail was defendant Deputy Warden Landerkin, who was known to have extreme animus toward Trump supporters.

37. This animus was expressed by making the following now-deleted posts on the social media site "X" (formerly known as Twitter):

a. "F--- everyone who supports Trump" (November 24, 2019);

b. "How are we allowing Trump and his lackeys destroy our country?" (November 24, 2019);

c. "About time they stop giving Trumps mouthpieces time to spew their lies" (February 8, 2020);

d. "Trump is doing more damage to this county then foreign terrorists ever have" (September 11, 2020);

e. "… if you are in the crowd behind Trump you are trash. While very animated, you are without conscious, feeling or morals…" (October 13, 2019);

f. "… Republican fascist" (July 27, 2019).[1]

38. Despite this known animus, the United States government, by and through its employees defendants Marshal Washington and Marshal Dixon, placed Plaintiff in the D.C. Jail for his pre-trial detention.

39. Upon information and belief, Defendants Washington and Dixon were responsible, in whole or in part, for decisions regarding the placement, transfer, housing, and continued detention of federal pretrial detainees, including January 6th Defendants housed at the D.C. Jail.

40. Upon information and belief, Washington and Dixon knew or reasonably should have known that Deputy Warden Landerkin had publicly expressed hostility toward supporters of President Donald J. Trump and individuals associated with the January 6 protests.

41. Upon information and belief, Washington and Dixon received inspection reports, grievances, judicial findings, or other notice concerning the conditions affecting January 6 detainees and nevertheless continued Plaintiff's placement there.

42. The statements attributed to Deputy Warden Landerkin were publicly available and widely circulated, including through social-media posts and public reporting.

---

[1] https://x.com/alexbruesewitz/status/1469666224552517637

43. Upon information and belief, Washington and Dixon knew or reasonably should have known that the continued placement of January 6 detainees in a facility operated by officials harboring such animus created a substantial risk that those detainees would be subjected to discriminatory treatment, punitive conditions, unequal treatment, retaliation, or other constitutional deprivations.

44. Despite that knowledge, Washington and Dixon continued authorizing, approving, maintaining, or permitting Plaintiff's placement and continued detention at the D.C. Jail.

45. Plaintiff was detained as a federal pretrial detainee and ultimately housed at facilities including the Correctional Treatment Facility and the District of Columbia Department of Corrections (the "D.C. Jail").

46. Plaintiff was in pre-trial detention in the D.C. Jail for approximately ten months.

47. From the date of his initial detention until August 6, 2021, Plaintiff was presumed innocent and had not been convicted of any offense.

48. During his detention, Plaintiff was housed among a group of detainees commonly referred to by correctional officials, government personnel, media organizations, and the public as "January 6th Detainees."

49. Upon information and belief, January 6th Detainees were subjected to restrictions, conditions, and treatment materially different from those imposed upon similarly situated federal pretrial detainees who were not charged in connection with events occurring on January 6, 2021.

50. Plaintiff and other January 6th Detainees were subjected to prolonged lockdowns, extensive restrictions on movement, recreation, social interaction, and visitation. These restrictions resulted in severe emotional distress, isolation, and deterioration of family relationships.

51. Plaintiff was also denied basic hygienic services, such as showers and haircuts, for extended periods of time.

52. Plaintiff was also denied meaningful access to his legal discovery and was denied visits from his legal counsel.

53. The D.C. Jail enacted onerous requirements on Plaintiff's counsel for counsel to provide discovery to Plaintiff. When Plaintiff's counsel fully complied with these requirements, the flash drive of discovery that Plaintiff's counsel tried to send to Plaintiff was returned to Plaintiff's counsel with no indication of why it was returned or what Plaintiff's counsel had to do differently for the discovery to be properly delivered to Plaintiff.

54. Plaintiff and other January 6th Detainees repeatedly attempted to challenge these conditions through the grievance process. While Plaintiff did file some grievances to challenge his conditions of confinement, correctional staff routinely obstructed those efforts by refusing grievance forms, delaying responses, altering submissions, discouraging complaints, and retaliating against detainees who sought administrative review.

55. The conditions imposed upon Plaintiff were not the product of individualized security assessments.

56. Plaintiff did not present a unique institutional threat that justified the restrictive conditions under which he was confined.

57. Defendants nevertheless maintained these restrictions for prolonged periods of time.

58. Upon information and belief, Defendants were aware of widespread complaints concerning the treatment of January 6th Detainees and the conditions under which they were confined.

59. Defendants received grievances, correspondence, reports, complaints, media inquiries, and other information placing them on notice of the conditions described herein.

60. Despite such notice, Defendants failed to take reasonable steps to remedy the unconstitutional conditions imposed upon Plaintiff.

61. The conditions described herein were excessive in relation to any legitimate governmental objective and functioned as punishment of Plaintiff before adjudication of guilt.

62. Although Plaintiff was charged with the serious offense of assaulting a police officer, Plaintiff sought to take responsibility for his actions and quickly agreed to plead guilty to the charge. Notably, Plaintiff was the first of the January 6th Defendants to plead guilty to assaulting a police officer.

63. On or about August 6, 2021, Plaintiff pled guilty to the second and third counts of his indictment: violating 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding and aiding and abetting) and 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers). The remaining charges in the indictment were dismissed as part of the plea deal.

64. In September 2021, Plaintiff was asked, through counsel, whether he would speak with the Select Committee to Investigate January 6th. Plaintiff readily agreed to speak with the Committee, even though he was specifically told that his cooperation would have no effect on his sentencing. However, officials at the D.C. Jail would not allow the U.S. House of Representatives to come inside the D.C. Jail to interview Plaintiff with counsel.

65. Plaintiff was able to meet with the FBI. At a subsequent debrief with the FBI, Plaintiff expressed genuine remorse and contrition over his actions, offering to personally apologize to the officer.

66. Thereafter, on November 10, 2021, Plaintiff was sentenced to forty-one (41) months' incarceration with credit for time served.

67. Plaintiff was incarcerated at Federal Correctional Institute Butner ("FCI Butner") and was there from February 10, 2022 until June 8, 2023.

68. Prior to his incarceration, Plaintiff had been diagnosed with leukemia and had been prescribed Tasigna to treat his condition. Plaintiff had been taking Tasigna for years with success.

69. Prior to incarceration, Plaintiff had also been attending monthly oncology appointments.

70. While incarcerated at FCI Butner, Plaintiff did not see any doctors in-person until approximately two weeks prior to his release.

71. While incarcerated at FCI Butner, Plaintiff was abruptly taken off his prescribed medication of Tasigna and instead prescribed Dasatinib and Bosulif.

72. Plaintiff's medication protocol was changed even though Plaintiff's existing protocol was working and Plaintiff was given no explanation for the change.

73. Dasatinib and Bosulif are substantially more aggressive medications and caused additional side effects, made Plaintiff ill, made Plaintiff nauseous, and caused Plaintiff gastrointestinal distress.

74. Plaintiff applied for compassionate release to a halfway house based on his status as a cancer patient. Upon information and belief, the warden of FCI Butner approved his request, Plaintiff was cleared by FCI Butner medical staff, and Plaintiff was accepted into a halfway house program. Upon information and belief, the Office of Medical Designations denied Plaintiff's request because he was not "medically appropriate."

75. The denial of Plaintiff's request was arbitrary and capricious as other inmates at Plaintiff's level of care (Care Level 3) were allowed to transfer to halfway houses.

76. On June 28, 2024, the Supreme Court of the United States issued its decision in *Fischer v. United States*, 603 U.S. 480 (2024), substantially narrowing the scope of 18 U.S.C. § 1512(c)(2) and rejecting the expansive interpretation utilized in many January 6 prosecutions.

**THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN**

77. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

78. At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6th investigations and prosecutions.

79. At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6th prosecutions within the District of Columbia.

80. Throughout their respective tenures, Garland and Graves repeatedly described January 6th prosecutions as among the Department's highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

81. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6th Defendants, including Plaintiff.

82. Upon information and belief, Garland and Graves approved or ratified the Department's widespread use of 18 U.S.C. § 1512(c)(2) despite substantial judicial disagreement concerning the scope of that statute and despite knowing that the charge materially increased detention exposure, sentencing exposure, and prosecutorial leverage.

83. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

84. Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and were intended, at least in part, to maximize deterrent effect and public example-making.

**<u>AS AND FOR A FIRST CAUSE OF ACTION</u>**
*42 U.S.C. § 1983*
*Violation of the First and Fifth Amendments*
*Unconstitutional Conditions of Pretrial Confinement*

85. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

86. At all relevant times, Plaintiff was a federal pretrial detainee housed at the D.C. Jail and was presumed innocent of all criminal charges.

87. Defendant Landerkin and the Doe Defendants acted under color of District of Columbia law.

88. The First Amendment protects the rights of individuals to engage in political speech, political association, expressive activity, petitioning activity, and other constitutionally protected conduct free from government retaliation, viewpoint discrimination, or political reprisal.

89. The Due Process Clause of the Fifth Amendment prohibits the punishment of pretrial detainees prior to an adjudication of guilt.

90. Plaintiff was detained because he had been charged in connection with the events of January 6th, 2021 and was housed among other detainees similarly charged.

91. Upon information and belief, Defendants viewed Plaintiff and other January 6th Detainees with hostility because of their actual or perceived political beliefs, political associations, support for President Donald J. Trump, participation in political demonstrations, and opposition to positions favored by Defendants.

92. Upon information and belief, Defendants intentionally subjected Plaintiff and other January 6th Detainees to restrictions, conditions, and treatment materially different from those imposed upon similarly situated pretrial detainees who were not associated with January 6.

93. These restrictions included, but were not limited to, prolonged lockdowns, severe limitations on movement, recreation, visitation, communication, social interaction, denial of basic hygiene, denial of access to legal services, and access to ordinary privileges afforded to other detainees.

94. Plaintiff further attempted to challenge these conditions through available grievance procedures and other complaints. Defendants obstructed, discouraged, ignored, altered, delayed, or retaliated against such efforts.

95. The restrictions imposed upon Plaintiff were not the product of individualized security determinations, disciplinary findings, or legitimate correctional necessities specific to Plaintiff.

96. Rather, upon information and belief, Defendants imposed and maintained these restrictions because of Plaintiff's actual or perceived political beliefs, associations, expressive conduct, protected activity, status as a January 6 defendant, and/or his attempts to complain about unconstitutional treatment.

97. The conditions imposed upon Plaintiff were excessive in relation to any legitimate governmental objective and were not reasonably related to institutional security, order, or administration.

98. As a result, the conditions functioned as punishment imposed upon Plaintiff before any adjudication of guilt.

99. By intentionally imposing punitive restrictions unrelated to legitimate governmental objectives, Defendants violated Plaintiff's rights under the Due Process Clause of the Fifth Amendment.

100. By imposing adverse treatment because of Plaintiff's actual or perceived political beliefs, political associations, protected expressive activity, status as a January 6 defendant, and/or complaints regarding jail conditions, Defendants violated Plaintiff's rights under the First Amendment.

101. Defendants acted intentionally, willfully, maliciously, recklessly, and with deliberate indifference to Plaintiff's constitutional rights.

102. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, emotional distress, humiliation, anxiety, psychological injury, pain and suffering, damage to reputation, and other economic and non-economic damages.

## AS AND FOR A SECOND CAUSE OF ACTION

*Fifth Amendment Equal Protection* – Bivens
*Federal Individual Defendants*

103. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

104. Defendants Garland and Graves (the "DOJ Defendants") personally participated in, approved, implemented, supervised, ratified, or knowingly permitted Department of Justice policies and practices governing the investigation, charging, detention, prosecution, and sentencing of January 6th Defendants, including Plaintiff.

105. Upon information and belief, those policies included the widespread use of 18 U.S.C. § 1512(c)(2), aggressive detention positions, enhanced charging decisions, and litigation strategies designed to increase detention exposure, sentencing exposure, prosecutorial leverage, public deterrence, and public example-making in January 6th cases.

106. Plaintiff alleges that the DOJ Defendants intentionally subjected January 6th Defendants, including Plaintiff, to investigative, charging, detention, and prosecutorial practices materially different from those employed against similarly situated criminal defendants because of their actual or perceived political viewpoints, associations, and participation in events occurring on January 6, 2021.

107. Upon information and belief, the DOJ Defendants received regular briefings concerning January 6th investigations and prosecutions, were aware of the policies challenged herein, and knowingly approved, ratified, or permitted their continued implementation.

108. No sufficient governmental interest justified the disparate treatment imposed upon Plaintiff. In the alternative, Defendants lacked a rational basis for treating Plaintiff differently from similarly situated defendants prosecuted for comparable conduct.

109. The DOJ Defendants' conduct violated the equal protection component of the Fifth Amendment and directly and proximately caused Plaintiff to suffer loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

**AS AND FOR A THIRD CAUSE OF ACTION**

*Fifth Amendment Due Process – Bivens*
*Deliberate Indifference to Known Risk of Constitutional Injury*
*Against Defendants Donald W. Washington and Robert Anthony Dixon*

110. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

111. At all relevant times, Washington and Dixon exercised authority over the placement, transfer, housing, and continued detention of federal pretrial detainees, including Plaintiff and other January 6th Detainees.

112. Upon information and belief, Washington and Dixon knew or reasonably should have known that Deputy Warden Kathleen Landerkin had publicly expressed hostility toward supporters of President Donald J. Trump and individuals associated with January 6, 2021.

113. Upon information and belief, Washington and Dixon further knew or reasonably should have known that placing January 6th Detainees in a facility operated by officials harboring such animus created a substantial risk that those detainees would be subjected to discriminatory treatment, punitive confinement conditions, retaliation, unequal treatment, and other constitutional deprivations.

114. Washington and Dixon received grievances, complaints, correspondence, reports, judicial findings, media coverage, and other information concerning the treatment of January 6th Detainees housed at the D.C. Jail and were therefore on notice of the risks described herein.

115. Despite such notice, Washington and Dixon continued authorizing, approving, maintaining, or permitting Plaintiff's placement and continued detention at the D.C. Jail.

116. Washington and Dixon failed to take reasonable measures to protect Plaintiff from foreseeable constitutional injuries arising from the conditions of confinement and discriminatory treatment described herein.

117. Their actions and omissions were intentional, reckless, malicious, or undertaken with deliberate indifference to Plaintiff's constitutional rights.

118. As a direct and proximate result of the foregoing, Plaintiff suffered loss of liberty, emotional distress, physical injury, reputational harm, and economic damages.

## AS AND FOR A FOURTH CAUSE OF ACTION

*Abuse of Process – FTCA*

119. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

120. This claim is asserted solely against Defendant the United States pursuant to the Federal Tort Claims Act.

121. Acting through its investigative and law-enforcement personnel acting within the scope of their employment, the United States employed and continued criminal process against Plaintiff for purposes beyond the legitimate adjudication of criminal liability.

122. Upon information and belief, federal officials used criminal process, including the continued pursuit of charges under 18 U.S.C. § 1512(c)(2), to obtain collateral objectives unrelated to the proper purpose of criminal proceedings, including increasing Plaintiff's detention exposure, sentencing exposure, litigation burdens, and public stigmatization, and maximizing the deterrent effect of January 6th prosecutions.

123. Federal officials continued utilizing such process despite substantial legal challenges to the Government's interpretation of 18 U.S.C. § 1512(c)(2) and despite knowing that

the challenged charge materially increased prosecutorial leverage and the consequences faced by Plaintiff.

124. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

125. Upon information and belief, federal officials used and maintained criminal process not solely to adjudicate Plaintiff's alleged criminal liability, but also to increase leverage over Plaintiff and similarly situated January 6th Defendants and to create public deterrence through the use of enhanced criminal charges.

126. The acts described herein constituted a willful misuse of criminal process for purposes other than those for which such process was designed.

127. As a direct and proximate result of the United States's abuse of process, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, litigation expenses, and other damages.

128. Defendant United States is liable for those injuries pursuant to the Federal Tort Claims Act.

**AS AND FOR A FIFTH CAUSE OF ACTION**
*Negligence – FTCA*

129. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

130. This claim is asserted solely against Defendant UNITED STATES OF AMERICA pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680.

131. At all relevant times, employees, agents, correctional personnel, medical personnel, and administrators of the Federal Bureau of Prisons and FCI Butner were acting within the scope of their federal employment.

132. Defendant United States owed Plaintiff a duty to exercise reasonable care for his safety, health, medical treatment, custody, and general well-being while he was incarcerated in federal custody.

133. Defendant United States further owed Plaintiff a duty to provide reasonably adequate medical care, reasonable protection from foreseeable harm, reasonable supervision of correctional personnel, and reasonable access to legal services consistent with applicable regulations and institutional policies.

134. Defendant United States further failed to exercise reasonable care in responding to Plaintiff's medical needs when they refused to allow Plaintiff to see a doctor in person and abruptly changed Plaintiff's medication protocol, causing Plaintiff to experience extreme and unnecessary side effects and illness, including nausea and gastrointestinal distress.

135. Despite knowledge of Plaintiff's prescription history and the foreseeable risks associated with abrupt change of cancer treatment medication, institutional medical personnel failed to adequately evaluate, monitor, treat, or mitigate Plaintiff's treatment protocol.

136. The foregoing acts and omissions constituted negligence under the law of North Carolina.

137. As a direct and proximate result of Defendant United States' negligence, Plaintiff suffered physical injury, pain and suffering, emotional distress, humiliation, anxiety, loss of dignity, aggravation of preexisting medical conditions, and other compensable damages. Plaintiff sustained damages in an amount to be determined at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION**
*(Intentional Infliction of Emotional Distress - FTCA)*

138. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

139. Defendant the United States, by and through its employees and agents, engaged in extreme and outrageous conduct, including portraying Plaintiff as a dangerous domestic terrorist, overcharging Plaintiff under inapplicable statutes, transporting and detaining Plaintiff in subhuman conditions, denying Plaintiff pretrial release, denying Plaintiff access to legal counsel and visitation while in pretrial detention, and withholding discovery from Plaintiff while Plaintiff was in pretrial detention and engaging in deceptive and misleading actions to conceal their efforts to withhold said discovery from Plaintiff.

140. Defendant the United States, by and through its employees and agents, acted intentionally or with reckless disregard of the high probability that their conduct would cause severe emotional distress.

141. The afore-described conduct was the proximate cause of Plaintiff's injuries.

142. As a result of the afore-described conduct, Plaintiff suffered severe emotional distress, including anxiety, trauma, humiliation, sleep disturbance, and fear of permanent disability or death.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to the Plaintiff, plus post-judgment interest;

b. Awarding punitive damages to the Plaintiff;

c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and

d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: September 29, 2026

Respectfully submitted,

/s/Alexander Lonstein
Alexander Lonstein
RAISER, KENNIFF & LONSTEIN, P.C.
99 Park Avenue, Suite 1530
New York, NY 10016
alexander@rkl.law